UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

TIMOTHY J. HANSEN,

               Petitioner,

     v.

BRENT REINKE,

            Respondent.

Case No. 1:03-cv-00212-EJL

**MEMORANDUM DECISION AND ORDER**

Petitioner Timothy J. Hansen filed a Petition for Writ of Habeas Corpus on May 7, 2003. This case was stayed for eight years while Petitioner was attempting to exhaust his claims in state court. The case was reopened in 2011, after which Petitioner filed a Amended Petition. (Dkt. 46.)

Previously in this habeas corpus action, the Court granted in part and denied in part Respondent's Motion for Partial Summary Dismissal. (Dkt. 64.) As a result, Claim One (A) was dismissed for failure to state claim, and Claims One (B) and (C), Two (A) and (B), Three (B), and Five were dismissed as procedurally defaulted.

Claims Three (A) and (C), Four, and Six were not dismissed, but proceeded to additional pleading and briefing. Respondent has filed an Answer and Brief in Support of Dismissal of Petitioner's Amended Petition for Writ of Habeas Corpus (Dk. 67), Petitioner has filed a Reply (Dkt. 70), and Respondent has filed a Sur-reply. (Dkt. 71.)

Having reviewed the record, including the state court record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that the decisional process would not be significantly aided by oral argument. Therefore, the Court will decide this matter on the record without oral argument. D. Idaho L. Civ. R. 7.1(d).

## BACKGROUND

### 1.    Circumstances Leading to Arrest and Search of Petitioner's Residence

In August 2000, the Idaho State Police (ISP) began investigating the Jerry Windle[1] property, located at 7695 Pocatello Creek Road, in Bannock County, Idaho, where they suspected methamphetamine was being manufactured. (State's Lodging B-10, p. 1.) At that time, Timothy Hansen ("Petitioner") lived in a bus parked on Windle's property. (*Id.*)

On September 12, 2000, under the direction of ISP Detective Gary Brush, Petitioner was stopped by Trooper John Kempf for driving without privileges, and Petitioner had two false identification cards in his possession. (State's Lodging A-2, p. 141-48.) On December 7, 2000, Petitioner purchased a gallon of iodine in Idaho. After that date, he traveled to Utah. On January 6, 2001, Petitioner was arrested in Utah on a charge of driving under the influence, and he spent the next six months in a Utah jail.

---

[1] The state record contains references to three spellings of this name, "Windle," "Windell," and "Wendell." The spelling "Windle" appears in the trial transcript and is used here. Similarly, Petitioner sometimes refers to State's informant James Mitchell Burt as "Burke," but the trial transcript reflects "Burt," which is used here.

On April 18, 2001, while Petitioner was in jail in Utah, a confidential informant met with Detectives Charles Burke and Glen Boodry and told them a person named Steven King was living in Petitioner's "old bus" and manufacturing methamphetamine there. The informant said that, in April 2001, "Steven King's residence [was] the same place Timothy Hansen lived prior to being sent to jail." (State's Lodging E-2, pp. 62-63.) The report of the interview mentioned Robert Zazweta and Troy Hall as sources of phosphorus used to make the drug. The report also mentioned that this activity was taking place on Windle's property, and that Windle was given one-fourth of the methamphetamine that King produced. (*Id.*)

Petitioner alleges that, after he was released from the Utah jail, he returned to Idaho on June 5, 2001. During that time, ISP investigators were conducting surveillance on the Windle property. At about 2:00 p.m. on June 7, detectives saw Petitioner leave the Windle property. (State's Lodging B-10, p. 1.) They stopped Petitioner's car because he had an outstanding Utah felony arrest warrant, and because he was driving without privileges. (*Id.*) Detectives arrested Petitioner at gunpoint, but without incident, and they handcuffed him and placed him in the back of a patrol car. (*Id.* at 2.)

Detective John Ganske told Petitioner that ISP believed that methamphetamine was being produced at 7695 Pocatello Creek Road, and Ganske asked Petitioner whether he knew anything about that. (State's Lodging B-1, p. 2.) Petitioner denied knowledge of a methamphetamine lab and he refused to consent to a search of the bus or the Windle

house. (*Id*.) Petitioner was left alone in the patrol car for about 50 minutes while Ganske searched Petitioner's vehicle and had discussions with other officers. (*Id*.)

Petitioner alleges that Ganske persisted in trying to pressure Petitioner to agree to take Ganske onto the Windle property. Ganske inquired whether Petitioner had any particular tow company that he wanted to tow his vehicle. (State's Lodging B-2, p. 2.) Petitioner asked that his vehicle not be towed. Ganske then tried to strike a deal with Petitioner, and the two discussed whether Ganske could try to call Utah officials regarding the warrant, whether Petitioner would be charged with driving on a suspended license, and what to do with Petitioner's car. Petitioner felt pressured by the detectives to agree to some terms to avoid additional criminal charges, and so he agreed that they could drive Petitioner's car back to the property, and that the detectives could search only the bus, looking for items only in plain view. Petitioner signed a consent-to-search form. (State's Lodging B-2, and Petitioner's Amended Petition, Dkt. 46, pp. 5-6.)

Petitioner has asserted that he was not living in the bus on June 7, 2001, but that he had just returned from Utah to retrieve some things he had in a storage shed on the Windle property. (Dkt. 46, p. 5.) However, Petitioner made various statements to officers that the bus and its contents were "his." For example, Detective Kempf testified that Petitioner had said, "he didn't want [officers] pawing through his shit." (State's Lodging A-2, p. 294.)

Officer John Kempf saw enough evidence in and around the bus to suspect that methamphetamine was being manufactured on the Windle property. (*Id*.) The ISP then

obtained a search warrant for the entire premises, and they found a methamphetamine lab inside the residence. (*Id*.)

On October 3, 2001, the prosecutor in Bannock County charged Petitioner with conspiracy to traffic in methamphetamine by manufacturing, between the dates of August 12, 2000, and August 1, 2001, in violation of Idaho Code § 37-2732B(a)(3) and § 37-2732(f). (State's Lodging A-1, pp.18-20.) An Amended Information charged that one of the parties to the conspiracy agreement performed at least one of the following overt acts during that time period: "(1) Purchased and/or supplied precursors for the manufacture of methamphetamine; or (2) Actively participated in the cooking process for the manufacture of methamphetamine; or (3) Provided a location for Steven King and/or other unnamed individuals to manufacture methamphetamine; or (4) Aided in the storage of equipment and chemicals used for manufacturing methamphetamine; or (5) Distributed methamphetamine." (State's Lodgings A-1, pp. 53-54, Amended Information; B-1, Jury Instruction 14.) Because Petitioner asserts he was in a Utah jail from January to June of 2001, the relevant time period for Petitioner's participation in the conspiracy is roughly August 12, 2000 to December 31, 2000.

## 2.  State Court Proceedings

Petitioner filed a motion to suppress all evidence that was found during the warrantless search of the bus and during the later warrant search of the Windle property, asserting that his consent to search was obtained by duress. (*Id.*, pp.44-45.) The trial court denied the motion after an evidentiary hearing. (State's Lodging A-2, pp.1-49.)

The case proceeded to a jury trial on December 18, 2001. (State's Lodging A-2, pp.50-439.) At trial, witnesses testified that the following individuals had been involved in manufacturing methamphetamine in the Windle residence and in Petitioner's bus: Petitioner Timothy Hansen, Jerry Windle, Steven King, Robert Zazweta, Amy Flukiger, and Theodora "Teddy" Salazar. The prosecution argued that these persons were members of the conspiracy that formed the basis of the manufacturing charges against King and Hansen. King was tried separately several weeks before Petitioner's trial.

At Petitioner's trial, Detective Gary Brush was called as a witness to testify about the complex process of manufacturing methamphetamine. He testified about the ingredients (including iodine, phosphorus, matchboxes, coffee filters, kitty litter, ephedrine pills), the cooking, the straining, the mixing, and the drying. He testified that the amount of iodine needed for methamphetamine production is far above a household-type use, and is more like the amount that a rancher would use to treat 400 cattle or a veterinarian would use to treat large animals in a year. (State's Lodging A-2, p. 252.)

Detective Brush also testified about the organization of a drug manufacturing conspiracy:

>They're basically organized – they're a group of people with one goal, and that's to manufacture meth. One may be the cook, one may be the helper, several may go out and get precursors, the ephedrine, the iodine, the phosphorus, that type of stuff, and then they bounce back and forth. One day we have may a person who – what we call a throw house, and he allows people to come to his house and make drugs, and then next time he may buy iodine and go to another house and trade that iodine for drugs.

(*Id.*, p. 132.)

Detective Brush testified that he had been investigating Zazweta, Fluckiger, Windle, Petitioner, and King as members of an organization. (*Id.*, p. 154.) Brush testified that Petitioner left the Windle property in his car with an empty propane tank and Petitioner met King in a KOA campground. When King was arrested shortly thereafter, he began to eat a piece of paper that was on his person. When officers took the remainder of the piece of paper from him, they discovered it was a recipe for manufacturing methamphetamine. (*Id.*, pp. 158-164.)

Detective Brush testified that a search of Windle's property revealed many signs of a methamphetamine lab. (*Id.*, pp. 174-90.) Residue from a container from the property testified positive for methamphetamine.[2] (*Id.*, p. 191.) Brush testified that Petitioner had two fake identification cards, "Rafeal Espin" and "Jeremy Sorter"—both bearing Petitioner's photograph. (*Id.*, p. 142-147.) Brush testified that people in drug

---

[2] Idaho State Police forensic lab senior criminalist Michael Anthony testified that he tested the container and found it positive for methamphetamine. (State's Lodging A-2, pp. 382-412.)

organizations commonly have different identities and use them when they make purchases of the supplies for methamphetamine production. (*Id.*, pp. 142-43.)

Brush also testified that he found "items of occupancy" on the bus, indicating that Petitioner lived on the bus, including letters sent to Petitioner at that address, letters Petitioner had written, court paperwork bearing Petitioner's name, and a check from Ada County Jail written to Petitioner. (State's Lodging A-2, p. 258.) Detective Donald Broughton testified he found "items of occupancy" on the bus belonging to Petitioner, Fluckiger, King, Dale Pfister, and Jan Keller. (*Id.*, p. 364.)

Detective John Kempf testified about the arrest of Petitioner and search of the bus. Outside the bus, Kempf observed a section of carpeting with a large iodine stain and a burn, as well as an igloo cooler with a glass tube fixed into the bottom of it, like a homemade condenser column. (*Id.*, p. 283-84.) Once inside, Kempf saw a methamphetamine pipe, a digital scale, and some small plastic baggies, and he testified about how the scales and bags are used to prepare methamphetamine for sale. (*Id.*, 273-83.) He also found two fake ID cards with Petitioner's photograph next to the scale. (*Id.*, pp. 294-95.)

While James Mitchell Burt was in jail with King and Petitioner, Burt offered to be an informant for the State. Burt testified at King's trial, and then at Petitioner's trial. Burt told the jury at Petitioner's trial that he had agreed to testify because methamphetamine had been devastating to his life and his family, he wanted the get the drug off the street,

and he wanted to sever his ties to the people that he was involved with. (State's Lodging A-2, pp. 62-64.)

Burt testified that he had been friends with Petitioner and with King. He testified that he had been to Petitioner's bus several times, and saw Zazweta, Salazar, and Petitioner engaged in the production of methamphetamine. (State's Lodging A-2, p. 67.) Burt testified that Zazweta was the "main cook" in the operation, and Petitioner was "like an assistant" to Zazweta, doing the cleaning and running errands to purchase ingredients. (*Id.*)

Burt testified that, while he, King, and Petitioner were in jail, they discussed the fact that, on December 7, 2000, King and Petitioner had gone to Idaho Falls to pick up some material and had purchased a gallon of iodine. (*Id.*, p. 70.) King and Petitioner had noticed police in the area, so they did not go back to the lab, but, instead, King rode his bike down the road so that an outstanding warrant on him would be executed away from the Windle property, to prevent the lab from being discovered. (*Id.*, pp. 71-72.)

Burt further testified that Petitioner said he would transport the drug to Utah on the airport shuttle bus so he did not have to drive it there himself. (*Id.*, p. 73.) Burt also testified that he, King, and Petitioner discussed how Petitioner had thought the lab had been cleaned up, making Petitioner think it was okay to allow Officer Ganske on the property, but, when Officer Ganske had exited his car, he had almost tripped over a condenser sitting in the yard. Burt testified, "We thought that was pretty funny, real humorous." (*Id.*, p. 74.)

**MEMORANDUM DECISION AND ORDER - 9**

Amy Fluckiger testified that she was the mother of a seven-year old girl. Fluckiger said she had been involved in the drug business for some time. On direct examination, the prosecutor asked Fluckiger why she was testifying, and she stated that she was trying to turn her life around, because her daughter didn't "deserve the lifestyle that doing drugs and making drugs gives her," and because she was offered immunity from prosecution regarding manufacturing drugs with Petitioner, King, and Windle. (*Id.*, p. 304-10.)

Fluckiger testified that Zazweta would do the cooking, and Petitioner would "make sure [Zazweta] had everything he needed to do the cook and, you know, he'd keep all the stuff there for him, sometimes clean up, just kind of like his helper." (*Id.*, p. 313.) She testified that she and Petitioner bought bottles of ephedrine pills, and that Petitioner bought iodine and anything Zazweta needed. (*Id.*, pp. 314-321.) Fluckiger testified that Petitioner called himself "the Prizemaster" because he would bring gifts for other people in the group when he came back from his shopping trips.[3] (*Id.*, pp. 321-23.)

On cross-examination, Petitioner's counsel reviewed Fluckiger's extensive criminal history, and the reasons she needed immunity from prosecution. (*Id.*, 322-34.) When asked whether she ever saw James Mitchell Burt on the Windle property, Fluckiger said that she never saw him cooking there. (*Id.*, p. 333.)

---

[3] The police reports indicate that Burt said Petitioner called himself the "Pricemaster" [sic], which tends to corroborate what Fluckiger said. (State's Lodging F-2.) Burt did not include this term in his trial testimony.

A store clerk, Pamela Esta, testified that Petitioner had come into her store and purchased a gallon of iodine and some HooFlex[4] on December 7, 2000. She had seen his valid identification, "Timothy Hansen," and had written his driver's license number on the receipt, which was introduced as an exhibit at trial. (*Id.*, pp. 336-340.) She testified that the store policy was to notify the manager and call the police whenever a large quantity of iodine was sold. (*Id.*, p. 340.)

Petitioner did not testify at trial. He called as a witness a longtime female friend who testified about Petitioner's trustworthiness as a friend. Petitioner also called his mother, in an effort to show that Petitioner worked as a drywaller in Windle's construction business, to show that Petitioner went to Utah to remodel a friend's basement, and to establish that Windle had horses on his property (part of Petitioner's theory of defense was that Windle had asked him to purchase iodine and HooFlex for Windle's horses). (*Id.*, pp. 422-23.) Both witnesses tried to establish that Petitioner had been living in Utah in 2001. Neither witness knew anything about what was going on at the Windle property.

After trial, Petitioner was convicted of the charged offense. At sentencing, Petitioner told the judge:

> Your Honor, Mr. Windle asked me to pick up some iodine and some HooFlex for his horses up at his house. I stopped at the C-A-L Ranch not thinking any big deal of it and picked it up and gave it to him. At that time I didn't know that iodine was even used for the making of methamphetamine.

---

[4] "HooFlex" is a horse hoof treatment.

State's Lodging A-2, p. 452.) Petitioner stated that he was not aware of any other ingredients needed to make methamphetamine. (*Id.*, p. 453.) Petitioner and his mother both commented at sentencing that Petitioner would not have used his true identity to purchase iodine and HooFlex if it was not for a legitimate purpose—to treat horses.

Petitioner also stated at sentencing: "I just want the court to know that I wasn't up at Jerry Windle's house for six months to a year straight making methamphetamine," and "I just wanted to clarify the fact that I wasn't there during that time that they were doing this." (State's Lodging A-2, p. 461.)

The Court responded: "The state never accused you of being up there all that time," and: "Nor do you have to be to be guilty." (*Id.*) Petitioner was sentenced to ten years fixed with five years indeterminate. (State's Lodging A-1, pp.65-67.)

The state court appellate and post-conviction procedural history is long and complex. The Court will mention only those parts that are relevant to the remaining issues.

Over a year after his conviction, Petitioner filed a (second) pro se "Motion to Dismiss Criminal Conviction" on a new factual ground, asserting that he recently learned that former county jail inmate James Mitchell Burt was acting as a state agent while they were in custody together at the jail, which amounted to a *Massiah* violation, and that the prosecutor knowingly presented false testimony when Burt testified at trial that he received nothing for his testimony. (State's Lodging E-1, pp.1-5). The trial court construed Petitioner's motion as a post-conviction relief application, and then denied

relief because the application was untimely and alleged no material facts that would support post-conviction relief.[5] (*Id.*, pp.7-10.)

Petitioner filed an appeal, but the case was remanded by consent of the parties because the trial court had erred in construing the motion to dismiss as a post-conviction application instead of a motion for new trial. (State's Lodgings F-1 to F-9.) On remand, a different state district judge held a brief hearing, in which Petitioner testified by telephone, and then denied Petitioner's motion to dismiss.[6] (State's Lodging E-2, pp.128, 140; E-3.) Petitioner then filed a notice of appeal.

Petitioner next filed a post-conviction relief application, which included a direct *Massiah* claim and a *Strickland* ineffective assistance of counsel claim based on *Massiah*. The application was later dismissed. (State's Lodging I-1, pp. 201-29.)

The appeal of the denial of the "Motion to Dismiss Conviction" and the appeal of the denial of the post-conviction application were initially consolidated before the Idaho Supreme Court, but Petitioner filed a motion to voluntarily dismiss the appeal from the denial of the "Motion to Dismiss Conviction." (State's Lodgings F-14, F-15.) The Idaho Supreme Court granted the motion, leaving only the appeal from the post-conviction action. (State's Lodging F-16).

---

[5] This decision was authored by State District Judge William H. Woodland, who presided over Petitioner's criminal trial.

[6] The new judge was the Honorable Ronald E. Bush, now a United States Magistrate Judge for the District of Idaho, who has had no part in deciding the present habeas corpus case.

During the pendency of the appeal, Petitioner filed a successive post-conviction application in the trial court. (State's Lodging I-1, pp.1-21.) The parties entered into a stipulation to complete the post-conviction cases based on briefing and documents submitted by the parties rather than an evidentiary hearing. (Stage's Lodging I-1, pp.77-79.) On September 24, 2008, the trial court dismissed all of the claims in both post-conviction applications. (*Id.*, pp. 201-24.)

Petitioner filed a notice of appeal, and was appointed new counsel. (State's Lodging I-1, pp. 230-32.) Petitioner's appellate counsel withdrew the *Massiah* claim at oral argument. (State's Lodging J-4, p.6 n.3.) The Idaho Court of Appeals resolved the remaining issues (including the *Strickland* claim based on the *Massiah* issue), affirming the state district court's decisions. (State's Lodging J-4.)

The federal Petition for Writ of Habeas Corpus was filed in the midst of Petitioner's state court actions on May 27, 2003. (Dkt. 3.) The Court granted a stay of the case until the state court matters were concluded. (Dkt. 12.) After the state court actions were completed and the stay in this action was lifted, Petitioner filed an Amended Petition in 2011. (Dkt. 46.) Petitioner has since been released from physical custody.

**3.      Earlier Proceedings in this Habeas Corpus Matter**

The following is a brief summary of the disposition of Petitioner's claims after the

Court decided Respondent's summary dismissal motion.

**A.      *Failure to State a Claim Upon Which Relief Can be Granted***

Earlier in this matter, Claim One (A), that an illegal search and seizure took place

when the Idaho State Police allegedly coerced his consent to search the property where

the evidence was found, in violation of the Fourth Amendment (Dkt. 46, p. 9), was

dismissed for failure to state a federal habeas corpus claim upon which relief can be

granted.

**B.      *Procedurally Defaulted Claims Subject to Dismissal***

The following claims were determined to be procedurally defaulted:

Claim One (B)        Violation of the Fifth Amendment "when he was illegally
                     interrogated on the side of the road after being arrested and
                     the State Police failed to advise him of his Miranda Rights."
                     (Dkt. 46, p. 9.)

Claim One (C)        Violation of the Fourteenth Amendment "when the statements
                     from the illegal interrogation as well as the evidence found on
                     the Windell property was used against him at his trial." (Dkt.
                     46, p .9.)

Claim Two (A)        "[T]he State deliberately tried to suppress the videotape of
                     Hansen's June 7, 2001 stop and arrest" violating the
                     Fourteenth Amendment and *Brady*." (Dkt. 46, pp.16-22);

Claim Two (B)        The prosecutor suborned perjury when he allegedly presented
                     false testimony regarding the existence of the videotape
                     violating *Napue*. (Dkt. 46, pp.16-22.)

| Claim Three (B) | Informant Burt receiving favorable treatment after he testified in violation of *Brady*. (Dkt. 46, p. 25.) |
| Claim Five | Suppression by the State of the videotape. (Dkt. 46, pp. 42-51.) |

The Court determined that Petitioner failed to show cause and prejudice or actual innocence to excuse the default of these claims. Because the new exception set forth in *Martinez v. Ryan*, 132 S.Ct. 1309, 1315 (2012), applies only to procedurally defaulted ineffective assistance of trial or direct appeal counsel claims, and Petitioner's procedurally defaulted claims do not fit within those categories, the *Martinez* exception has no applicability to the cause and prejudice issue before the Court.

## C.    *Revisiting Procedurally Defaulted Claim Three (A)*

Claim Three (A) is that the State's use of James Burt as a jailhouse informant to solicit incriminating statements from Petitioner violated his Sixth Amendment right to be represented by counsel, as defined by *Massiah v. United States*, 377 U.S. 201, 206 (1964).

The Court earlier determined that Claim Three (A) was procedurally defaulted, but because cause existed under *Edwards v. Carpenter,* 529 U.S. 446, 454 (2000)—that Petitioner had fully exhausted his ineffective assistance of counsel claim asserting that trial counsel should have brought the *Massiah* claim in a motion to suppress prior to trial—Petitioner would be permitted to proceed on that claim if he could also show prejudice at the time the Court decided the merits of his claims.

Upon analysis of the merits of the *Massiah* claim, the Court concludes that the basis upon which it relied earlier to find "cause" for this claim under *Edwards v. Carpenter*—ineffective assistance of trial counsel for failing to file a motion to suppress—has no causal connection to the default of this claim, because the State did not disclose to trial counsel that Burt was a State informant, and, thus, trial counsel would have had no reason to assert a *Massiah* claim at that time. Neither was the claim known at the time of the direct appeal, which concluded May 1, 2003 (the Motion to Dismiss asserting that Burt's informant status was newly discovered was filed on June 11, 2003).

As for other means of establishing "cause," the Court concludes that *Martinez v. Ryan* does not extend to *Massiah* claims, and, therefore, Petitioner cannot rely on that exception as "cause." Accordingly, the Court reconsiders its earlier decision and concludes that there is no "cause" for the procedural default of the *Massiah* claim, and it is subject to dismissal with prejudice.

However, because Petitioner's *Massiah* issue was the basis for a *Strickland* ineffective assistance of trial counsel claim that was properly exhausted, the Court will address it on the merits in that context.

## STANDARD OF LAW FOR CLAIMS PROCEEDING
## TO A MERITS DETERMINATION

Federal habeas corpus relief may be granted on claims adjudicated on the merits in a state court judgment when the federal court determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.

§ 2254(a). Under § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act (AEDPA), federal habeas corpus relief is further limited to instances where the state court adjudication of the merits:

1.      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[7]

When a party contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, for a decision to be "contrary to" clearly established federal law, the petitioner must show that the state court applied a rule of law different from the governing law set forth in United States Supreme Court precedent, or that the state court confronted a set of facts that were materially indistinguishable from a decision of the Supreme Court and nevertheless arrived at a result different from the Supreme Court's precedent. *Williams v. Taylor*, 529 U.S. 362, 404-06 (2000).

---

[7]A state court need not "give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).

Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1), the petitioner must show that the state court was "unreasonable in applying the governing legal principle to the facts of the case." *Id.* at 413. The United States Supreme Court has explained: "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

A federal court cannot grant relief simply because it concludes in its independent judgment that the decision is incorrect or wrong; the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002). To warrant habeas corpus relief, a petitioner must show that the challenged state-court ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S.Ct. 770, 786-87 (2011).

In *Richter*, the United States Supreme Court explained that, under § 2254(d), a habeas court (1) "must determine what arguments or theories supported or . . . could have supported, the state court's decision;" and (2) "then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at

786. If fairminded jurists could disagree on the correctness of the state court's decision, then a federal court cannot grant relief under § 2254(d)(1). *Id.* The Supreme Court emphasized: "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

As to the facts, the United States Supreme Court has recently clarified "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011). This means that evidence not presented to the state court may not be introduced on federal habeas review if a claim was adjudicated on the merits in state court and if the underlying factual determination of the state court was not unreasonable. *See Murray v. Schriro*, 745 F.3d 984, 999 (9th Cir. 2014).

When a party contests the reasonableness of the state court's factual determinations under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

The United States Court of Appeals for the Ninth Circuit has identified five types of unreasonable factual determinations that result from procedural flaws that occurred in state court proceedings: (1) when state courts fail to make a finding of fact; (2) when courts mistakenly make factual findings under the wrong legal standard; (3) when "the fact-finding process itself is defective," such as when a state court "makes evidentiary findings without holding a hearing"; (4) when

courts "plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim; or (5) when "the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Taylor v. Maddox*, 366 F.3d. 992, 1000-01 (9th Cir. 2004). State court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

If the state court factual determination was unreasonable, then the federal court is not limited by § 2254(d)(1), but proceeds to a de novo review of the claims, which may include consideration of evidence outside the state court record, subject to the limitations of § 2254(e)(2). *Murray v. Schriro*, 745 F.3d at 1000.

## REVIEW OF MERITS OF INEFFECTIVE
## ASSISTANCE OF COUNSEL CLAIMS

1. **Standard of Law**

A criminal defendant has a constitutional right to the assistance of counsel under the Sixth Amendment, made applicable to the states through the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335 (1963). In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established the proper test to be applied to claims alleging constitutionally inadequate representation. To succeed on such a claim, a petitioner must show that (1) counsel's performance was deficient in that it fell below an objective standard of

reasonableness and that (2) the petitioner was prejudiced thereby. *Id*. at 684.

Prejudice under these circumstances means that there is a reasonable probability

that, but for counsel's errors, the result of the proceeding would have been

different. *Id*. at 684, 694. A reasonable probability is one sufficient to undermine

confidence in the outcome. *Id*. at 694.

In assessing whether trial counsel's representation fell below an objective

standard of competence under *Strickland*'s first prong, a reviewing court must

view counsel's conduct at the time that the challenged act or omission occurred,

making an effort to eliminate the distorting lens of hindsight. *Id*. at 689. The court

must indulge in the strong presumption that counsel's conduct fell within the wide

range of reasonable professional assistance. *Id*. The pertinent inquiry "is not what

defense counsel could have pursued, but rather whether the choices made by

defense counsel were reasonable." *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th

Cir. 1998).

A petitioner must establish both incompetence and prejudice to prove an

ineffective assistance of counsel claim. 466 U.S. at 697. On habeas review, the

court may consider either prong of the *Strickland* test first, or it may address both

prongs, even if one is deficient and will compel denial. *Id.*

**2.      Claim Three (A) as a *Strickland* Claim re: *Massiah* Issue**

Claim Three (A) is that the State's use of James Mitchell Burt as a jailhouse

informant to solicit incriminating statements from Petitioner violated his Sixth

Amendment right to be represented by counsel, as defined by *Massiah v. United States*, 377 U.S. 201, 206 (1964).

### A.    *Counsel Could Not Have Pursued a Motion to Suppress*

The ineffective assistance of counsel claim based on *Massiah* fails to state a federal habeas corpus claim upon which relief can be granted because neither trial counsel nor direct appeal counsel knew that Burt was an informant prior to or during trial or during direct appeal, due to the prosecution's failure to disclose that information. Without that information, there would have been no reason to assert a *Massiah* claim during either counsel's representation of Petitioner. Because Petitioner has not asserted facts that would support a *Strickland* claim, and amendment would not cure the deficiency, the claim is subject to dismissal with prejudice.

### B.    *Merits of Strickland/Massiah Claim Adjudicated by State Court*

Notwithstanding the fact that trial counsel could not have known of the facts supporting a *Massiah* claim during counsel's representation of Petitioner, the Idaho Court of Appeals nevertheless adjudicated the merits of a *Strickland* claim, and, in the course of doing so, determined that the underlying *Massiah* issue was without merit. (State's Lodging J-4, pp. 13-14.) Therefore, alternatively, the Court reviews the underlying merits of the *Strickland/Massiah* claim without regard to whether counsel could have known that the *Massiah* claim existed at the time of representation.

(1)    *Massiah* Standard of Law

Plaintiff alleges that Burt's testimony violated *Massiah v. United States*, which provides that, under the Sixth Amendment, a government agent cannot "deliberately elicit" incriminating statements from a charged defendant without the presence of counsel. 377 U.S. at 206. In *Massiah*, the government recruited a co-defendant and installed a listening device in his car, and then the co-defendant had conversations in the car with the defendant, which resulted in the defendant making several incriminating statements that were used against him at trial—notwithstanding the fact that the statements were collected post-indictment and without the defendant's counsel present. 377 U.S. at 202-03. The United States Supreme Court held that this government action violated Massiah's Sixth Amendment right to counsel.

*Massiah* applies in the context of jailhouse informants. In *United States v. Henry*, 447 U.S. 264 (1980), a government agent working on a robbery case contacted an inmate named Nichols, who was housed in the same cellblock as Henry, a defendant in the robbery case. Nichols was instructed to "be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank robbery." 447 U.S. at 266. According to Nichols' statements, "Nichols was not a passive listener; rather, he had 'some conversations with Mr. Henry' while he was in jail and Henry's incriminatory statements were 'the product of this conversation.'" *Id*. at 271.

Nichols informed the agent that Henry had told him about the robbery of the bank, and Nichols was paid for furnishing the information. *Id*. This government action violated Henry's Sixth Amendment rights. In *Henry*, the Supreme Court clarified: "In *Massiah*, no inquiry was made as to whether Massiah or his codefendant first raised the subject of the crime under investigation," *id*. at 271-72; and "[w]hether Massiah's codefendant questioned Massiah about the crime or merely engaged in general conversation about it was a matter of no concern to the *Massiah* Court." 447 U.S. at 272 n.10. Rather, application of the *Massiah* rule turned on whether the state had "intentionally creat[ed] a situation likely to induce Henry to make incriminating statements without the assistance of counsel."

*Id*. at 274.

In 1985, the Supreme Court further explained that the *Massiah* rule applies even when the defendant initiates the contact with the informant, if the state "knowingly circumvent[s] the accused's right to have counsel present." *Maine v. Moulton*, 474 U.S. 159, 176 (1985). It is only when, "by luck or happenstance" that "the State obtains incriminating statements from the accused after the right to counsel has attached," that the Sixth Amendment is not violated. *Id*. at 176.

In *Henry*, the Court acknowledged that it had *not* been "called upon to pass on the situation where an informant is placed in close proximity but makes no effort to stimulate conversations about the crime charged." 447 U.S. at 272 n.9. In

1986, the United States Supreme Court filled in some of the holes left by its earlier

cases following *Massiah*, holding that the defendant must demonstrate not only

that "the informant, either through prior arrangement or voluntarily, reported his

incriminating statements to the police," but that "the police and their informant

took some action, beyond merely listening, that was designed deliberately to elicit

incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986).

In *Kuhlmann*, the Court explained:

> The state court found that Officer Cullen had instructed Lee
> only to listen to respondent for the purpose of determining the
> identities of the other participants in the robbery and murder. The
> police already had solid evidence of respondent's participation. The
> court further found that Lee followed those instructions, that he "at
> no time asked any questions" of respondent concerning the pending
> charges, and that he "only listened" to respondent's "spontaneous"
> and "unsolicited" statements. The *only remark* made by Lee that has
> any support in this record was his comment that respondent's initial
> version of his participation in the crimes "didn't sound too good."

477 U.S. at 460 (emphasis added).

The United States Supreme Court held that the court of appeals wrongly

decided that the police "deliberately elicited" the defendant's incriminating

statements under these circumstances. To "deliberately elicit" incriminating

information, the defendant must show more than the mere fact that an informant

reported the information to police officers. *Id.* at 459. No violation is shown

"where an informant is placed in close proximity but makes no effort to stimulate

conversations about the crime charged." *See Henry*, 447 U.S. at 271 n. 9. In

Kuhlmann, the informant did not know the defendant prior to being placed in the same cell, did not hold a conversation with him, but made only one remark in response to the defendant's outpouring.

In *Fellers v. United States*, 540 U.S. 519 (2004), in a slightly different context, the Court again explained that *Massiah* covers not only questions, but a *discussion* about the crime:

> The Court of Appeals erred in holding that the absence of an "interrogation" foreclosed petitioner's claim that the jailhouse statements should have been suppressed as fruits of the statements taken from petitioner at his home. First, there is no question that the officers in this case "deliberately elicited" information from petitioner. Indeed, the officers, upon arriving at petitioner's house, informed him that their purpose in coming was to discuss his involvement in the distribution of methamphetamine and his association with certain charged co-conspirators. 285 F.3d at 723. Because the ensuing discussion took place after petitioner had been indicted, outside the presence of counsel, and in the absence of any waiver of petitioner's Sixth Amendment rights, the Court of Appeals erred in holding that the officers' actions did not violate the Sixth Amendment standards established in *Massiah*, *supra*, and its progeny.

*Id.* at 524-25.

(2) <u>Evidence Presented to State Court</u>

James Mitchell Burt testified that Petitioner made several incriminating statements to Burt when Petitioner, Burt, and Steven King were incarcerated in the Bannock County Jail together. Petitioner alleges that Burt was placed in a cell with Petitioner by State investigators to elicit incriminating statements from Petitioner,

and, therefore, Burt was a State agent whose actions violated the Sixth Amendment.

The Affidavit of Detective Gary Brush outlines the extent of police involvement with James Burt. Detective Brush states: "On November 1, 2001, I interviewed James Burt at the Bannock County Jail in Pocatello, Idaho. Mr. Burt informed myself and Detective Kyle Fulmer that he had information regarding the investigation of Timothy Hansen and wanted to cooperate with law enforcement in order to clean up his life and help get his wife off methamphetamine." (State's Lodging I-1, pp.198-99.)

During the interview on November 1, 2001, Mr. Burt reported: (1) he knew King and Petitioner prior to their incarceration; (2) King called himself "the master" and "the chef" because of his methamphetamine manufacturing skills; (3) King said he was always one step ahead of the police and would stay that way; (4) Petitioner called himself "the Pricemaster" because of his burglary skills, and Petitioner revealed how he stole small, expensive items by putting them in boxes of less expensive items; (5) the lab equipment on Windle's property belonged to Windle; (6) King had items in his truck at the time of his arrest that would have put him in prison for a long period of time, had the items been found; (7) the condenser Officer Ganske tripped over during the consent search of the bus belonged to Petitioner, but King and Petitioner was going to say that it belonged to Windle; (8) after looking over the police reports, King said one stated he

manufactured methamphetamine16 times a week, but it was only about twice a week on the Windle property; (9) Petitioner was going to testify in court that the gallon of iodine he purchased was ordered by Windle for the care of Windle's brother's horses; (10) Windle was King's helper, but King and Petitioner were going to testify that Windle was the mastermind of the methamphetamine production operation; and (11) Petitioner's job when he was released from jail was to keep Windle from testifying. (State's Lodging F-2.) The interview lasted about 25 minutes. (State's Lodging I-1, p. )

Detective Brush states that he provided warnings to Burt about the extent to which he could discuss the criminal case with Petitioner in future encounters: "We informed him that he was forbidden from attempting to elicit any information from Mr. Hansen while incarcerated. We stressed continually through our interview that he could not ask Hansen any questions regarding any crime or our investigation." Brush states: "Mr. Burt acknowledged that he would not do this." (State's Lodging I-1, pp.198-99.)

Later in the day on November 1, 2001, and on November 2, 2001, Burt called Detective Fullmer to inform him that King told him King injured his hand on November 1 with a glass tube that had exploded during the methamphetamine manufacturing process.

On November 13, 2001, Burt had a second interview with Detective Brush, Detective Russell Wheatley, and with Prosecutor Dennis Wilkinson. Detective

Brush declares by affidavit: "I verified with Mr. Burt that the information that he had was completely voluntary and that he did not elicit any statements from Mr. Hansen." (State's Lodging I-1, p. 199.)

On November 13, 2001, Burt provided the following information: (1) Petitioner used a fictitious ID to purchase the iodine; (2) officers did not find glass tubes in their search that were hidden in the bus that were of the same type that injured King's hand; (3) King had asked Burt to ask Petitioner why he didn't do something to keep Windle from testifying against them when Petitioner was out of jail; when Burt asked him, Petitioner replied that it would be harassing a witness; but Petitioner then asked another inmate, Ernesto Morna to stop Windle from testifying, and the "price master" would give him a prize; (4) Burt had observed Salazar, Zazweta, Petitioner, and Karen Honas manufacturing methamphetamine in the bus; (5) Burt had observed Zazweta and Petitioner manufacturing methamphetamine in the bus; (6) Petitioner said the police made a mess of their operation, and, before then, they "really had it going" for over a year before the police caught them; (7) Burt overhead Petitioner say to someone else that he transported a lot of methamphetamine from Pocatello to Salt Lake City on the airport shuttle bus; (8) on November 11, 2001, Petitioner threatened Burt by telling him he didn't want to have the same thing happen to him as was going to happen to Windle, and so Burt should not talk to the police, and should tell them only that "he has never been on the bus'" (9) Petitioner gave Brian Hicks four ounces of

methamphetamine the day he was released from jail; (10) King said he was with Petitioner when Petitioner bought the iodine; (11) King said he left the Windle property on his bike on December 7, 2000, the day of the arrest, because he was willing to sacrifice himself to keep officers from discovering the methamphetamine lab on the property; (12) Petitioner said it was a good trick for King to ride off on his bike to throw off officers; (13) Petitioner believed Windle's daughter might testify, and he said he would rape her when he was released if she testified; (14) Petitioner said if Windle testified against him, he would hunt Windle down and get even, and that he would try not to kill him, but he probably would; (15) Petitioner used to have a direct wire phone to the bus; (16) King said it was his job to turn the iodine into iodine crystals. (State's Lodging F-2.)

At the end of the interview, "Mr. Burt was again told that he was not to elicit any information from Mr. Hansen." (State's Lodging I-1, p. 199.) Detective Brush reported that Burt "acknowledged that he had not and would not elicit any information from Mr. Hansen." (*Id.*)

At the hearing on the motion to dismiss conviction (motion for a new trial), Petitioner testified as follows:

> Q.   You have a complaint about a fellow that was in jail with you that turned State's evidence, is that correct?
>
> A.   Yes, that's James Burke [sic].
>
> Q.   And do you feel that he was an agent for the State to illicit incriminating evidence from you?

A.     He's taken certain questions that I was asked of Stevie
       King and he was involving himself in these
       conversations and then he is taking these statements
       and construing them around to get himself immunity.
       Then he comes in and testifies at Court that he hasn't
       been given any immunity. Well, Mr. Burke is a felon
       that is parole [sic]. He has violated his parole and he's
       in jail waiting to go back to prison.

Q.     Did you make the statements that . . . .?

A.     They took Mr. Burke [sic] and then on November 1st
       they moved him down in the trustee pod in a bed right
       next to mine, and Mr. Burke [sic] is down there
       following me around asking me questions.

Q.     The statements that Mr. Burke [sic] made in Court, did
       you in fact make those statements to him?

A.     No I — some of the statements we talked about some
       things but lots of the stuff Mr. Burke testified to in
       Court he takes and construes around and . . . said I
       made these statements I never made to him.

Q.     There was a witness or two at the trial that indicated
       that they saw you cooking. Do you recall that
       testimony?

A.     Yes, I remember that testimony.

Q.     And by cooking that was cooking methamphetamine,
       correct?

A.     Yes.

Q.     Were you cooking on the dates that they told you—that
       they testified you were cooking?

A.     I have never cooked methamphetamine in my life.

(State's Lodging E-3, pp. 10-11.)

Although Petitioner and his counsel were given the police reports of the interviews with Burt (State's Lodging F-2) prior to trial, the State did not reveal to Petitioner and his counsel the information that Burt was an informant. (State's Lodging E-1, p. 4.) That fact was apparent at the hearing on the "Motion to Dismiss Conviction," when the prosecutor argued:

> [W]ith regard to the newly discovered evidence, the defendant knew when he was in jail. That is not newly discovered evidence. His attorney had an opportunity to question James Burke whether or not he was a government informant. That was clearly questions at trial [sic]."

(State's Lodging E-3, p. 17.)

In support of Petitioner's "Motion to Dismiss Conviction," Petitioner filed the affidavits of three inmates to support his claim that he did not know Burt was a state informant: (1) David Hill declared that Burt told him on several occasions that he was going to meet with detectives because they wanted him to try to get Steven King and Timothy Hansen to make incriminating statements about the methamphetamine manufacturing charges, and that Burt told Hill that he never saw anything going on at the bus and didn't tell the detectives anything; (2) Bryan Ellis said that he saw Burt talking with narcotics detectives, but Burt said he had nothing to tell them, and that Ellis never heard Petitioner discussing his case with Burt or anyone else; and (3) Adrian Flores declared that "[o]n a daily basis from the end of October 2001 to mid-November 2001, I observed James Burt frequently coming and going from the Detective Division located in Administration," that

Burt said detectives wanted him to talk about King and Petitioner, but Burt would not talk about them, and that it was common knowledge that Burt was working as an agent for the detectives. (State's Lodging F-2.)

At Petitioner's trial, Burt testified that Petitioner told Burt, "we had it going on up there," meaning that Petitioner was involved in manufacturing methamphetamine. Burt also testified that Petitioner said that one way of transporting the drugs to Utah was via an airport shuttle bus because it was better than driving it himself, and that the methamphetamine they produced was for sale. (State's Lodging A-2, pp. 64-73.)

Burt also testified that he had a three-way conversation among himself, King, and Petitioner, while they were reviewing discovery papers on one of their cases, and Burt learned that King and Petitioner thought the police were watching them, and that Petitioner stopped at the store to buy a gallon of iodine. Also during the three-way conversation, they discussed how Officer Ganske tripped over the homemade condenser when he went to search the property around the bus. Burt testified that Petitioner did not say the condenser was his, but that he just "took it that it was his [Petitioner's]." (*Id.*, pp. 70-74.)

(3)     State Court Decisions

In the context of determining the "Motion to Dismiss Conviction," construed as a motion for a new trial in the criminal case, the state district court found that the evidence "when taken as a whole, does appear to show that Burt was

working on behalf of the state to obtain incriminating statements." (State's Lodging E-2, p. 142.) The state district court then determined that Petitioner had produced insufficient evidence to support his *Massiah* claim, and that the court could not "determine whether Burt in fact took affirmative action to elicit incriminating statements from Petitioner or whether any such action was fruitful, *i.e.*, whether Hansen answered Burt's questions with incriminating statements." (*Id.*) The state district court also found "a credibility issue with Hansen's testimony: While Hansen may have been the only person to testify as to Burt's efforts to elicit incriminating statements, the Court is not required to believe Hansen's testimony, especially in light of the fact that Hansen is currently in prison, he seeks to be granted a new trial, his testimony is self-serving and there is no corroboration." (*Id.*)

The state district court again denied the claim in the context of the post-conviction matter, reasoning, in part:

> The record . . . indicates, and Hansen himself relies upon the fact, that Steven King requested Burt to contact Hansen in the jail to ask the allegedly incriminating questions. King is not a State actor and there is no evidence that King was seeking to incriminate Hansen in his request to Burt. Significantly, the only allegations Hansen makes regarding Burt's actions in eliciting statements is Burt's alleged participation in this three-way conversation with Steven King. Hansen does not contest the veracity of the information summarized in the statements from Burt's "Report of Investigation" regarding (1) the fact that the methamphetamine lab had been in production for over a year, (2) that Hansen had transported methamphetamine from Pocatello to Salt Lake City, (3) that Hansen had given Brian Hicks four ounces of methamphetamine, (4) that

King and Hansen were cooking methamphetamine on December 7, 2000, (5) that Hansen had purchased a quantity of iodine on December 7, 2001 [sic], or (6) that it was Hansen's job to turn iodine into iodine crystals for the manufacturing process."[8] Hansen does not present any evidence that Burt sought to elicit the remainder of this information while acting as a State agent.

(State's Lodging I-1, pp. 222-23.)

The Idaho Court of Appeals recognized that Plaintiff had withdrawn the *Massiah* claim from the post-conviction action, and that Plaintiff had not presented any argument to support his claim that his counsel was ineffective for failing to file a motion to suppress the Burt testimony. The Idaho Court of Appeals nevertheless addressed the merits of the claim as an ineffective assistance of counsel claim, and rejected it, concluding that Petitioner "failed to demonstrate deficient performance or prejudice," because "a motion to suppress would not have been successful." (State's Lodging J-4, p. 13.) That court reasoned:

> With regard to the element that the informant must take some action, beyond merely listening, in order to deliberately elicit incriminating statements, Hansen points to his testimony at the hearing on his second motion for new trial where he stated: "They took Mr. Burke (sic) and then on November 1st they moved him down in the trustee pod in a bed right next to mine, and Mr. Burke [sic] is down there following me around asking me questions." Hansen contends that this demonstrates that Burt was not merely a passive listener and that he deliberately elicited incriminating statements.

---

[8] The police report simply says: "King informed him it was *his* job to turn the iodine to iodine crystals." (State's Lodging F-2, emphasis added.) Amy Fluckiger testified that *Steven King's* primary role was "to get the iodine crystals from the iodine." (State's Lodging A-2, p. 313.) It appears that the state district court mistakenly attributed this job to Hansen, not King.

When placed in context of Hansen's entire testimony at the hearing, it becomes apparent that Hansen did not testify that Burt elicited incriminating statements. Rather, Hansen denied having made any incriminating statements to Burt at all. In denying Hansen's motion for a new trial, the district court, reviewing the evidence presented by Hansen, stated: "Additionally, Hansen's own testimony at the hearing does not show that Burt asked him any incriminating questions or otherwise took affirmative action to elicit any incriminating statements from Hansen." Hansen presented no evidence in his post-conviction proceedings as to what specific questions were asked, what specific answers were given, and whether any of the questions or answers were incriminating in nature. Therefore, Hansen has failed to demonstrate deficient performance or prejudice as a motion to suppress would not have been successful.

(State's Lodging J-4, p. 14.)

(4)    Analysis

There is no question that the state court record established that law enforcement officers recruited Burt to obtain information from Petitioner and placed Burt in Petitioner's cell, which is one element of a *Massiah* claim. The more pointed question is *when* Burt was recruited, because only the information obtained *after* recruitment is subject to *Massiah*. The record reflects that the first interview between Burt and the detectives took place on November 1, 2001, at 9:55 a.m. Nothing in the record suggests that detectives moved Burt to Petitioner's cell *before* Burt approached detectives to tell them information and to volunteer to be an informant. Neither does anything suggest that Burt had not obtained the information from Petitioner that he disclosed on November 1 during the pre-

informant time that they were incarcerated together at the jail between September 20, 2001 and November 1, 2001.[9]

Rather, the record reflects that Burt obtained information from Petitioner on his own, volunteered to be an informant, told detectives what he knew, and then *after the detectives were aware that Burt wanted to be an informant and had relevant information to offer*, they accepted his offer and moved him into the bed next to Petitioner later in the day on November 1, 2001. Therefore, anything Petitioner said to Burt before November 1, 2001, is outside the scope of *Massiah*, because Burt was not then a government agent. *See U.S. v. Stevens*, 83 F.3d 60, 64 (2d Cir. 1996).

Before detectives accepted the offer to use Burt as an informant, they told him not to elicit statements from Petitioner. The focus of this claim is whether Burt's actions constitute "deliberately eliciting" statements from Petitioner between November 1, 2001, and November 13, 2001, the next time he reported to detectives.

A preliminary task is determining which trial testimony of Burt corresponds to information in the second police report that Burt learned from Petitioner after he became a government informant. Those items in common are that Petitioner told

---

[9] The police report states that King, Burt, and Petitioner spent a lot of time together while being incarcerated at the Bannock County Jail, and Burt was incarcerated on September 1, 2001, while King was incarcerated on September 20, 2001. (State's Lodging F-2.) Inmate Adrian Flores's Affidavit shows that the relevant time period when Burt and Petitioner were in jail was between September or October and November 2001. (*Id.*)

Burt, "we had it going on up there," and that Petitioner said that the methamphetamine they produced was for sale.[10] (State's Lodging A-2, pp. 64-73.)

Burt testified, and Petitioner seems to agree, that this information was produced during a three-way conversation between Burt, King, and Petitioner.[11] Burt's testimony at trial established that Petitioner, King, and Burt were good friends, and they engaged in friendly conversation in the jail, sitting together trying to determine the dates of events that were relevant to their criminal charges, and laughing about how Petitioner thought they had cleaned up the drug manufacturing equipment and supplies from the bus, but the officer who was there to search the premises almost tripped over a homemade condenser outside the bus.

The state district court also had before it the transcript of King's trial, where Burt testified that his conversations with Petitioner were mainly about the incidents relevant to the pending criminal charges:

Q.    Was Tim Hansen also in jail with you?

A.    Yes, he was.

_____

[10] The following items that are common to the November 13, 2001 police report and Burt's trial testimony are *not* subject to *Massiah*, because they were the product of Burt's own observations outside of the jail, not the product of a conversation between Petitioner and Burt during Burt's agency relationship with the State: (1) Burt had observed Salazar, Zazaweta, Petitioner, and Karen Honas manufacturing methamphetamine in the bus, and (2) Burt had observed Zazweta and Petitioner manufacturing methamphetamine in the bus.

[11] In addition, Burt stated to the detectives that he overhead Petitioner say to someone else that he transported a lot of methamphetamine from Pocatello to Salt Lake City on the shuttle bus. This is even beyond the "passive listener" test, because Petitioner was not talking to Burt when he allegedly said this. *Massiah* does not apply to this statement.

**MEMORANDUM DECISION AND ORDER - 39**

Q.     And what was your relationship like with Mr. Hansen?

A.     My relationship with Mr. Hansen was just more or less of a social thing. He was — I knew Timmy from a couple of years ago, and we talked more about things that have happened, why we were in jail, than we did during the two years that I've known him.

(State's Lodging I-1, p. 122.)

The Idaho courts that addressed Petitioner's *Massiah* claim do not acknowledge that information obtained in a conversation that is derived from a situation set up by the State to obtain information from a defendant without the presence of his attorney—even though there is no active questioning—still can be a *Massiah* violation. The facts of *Massiah*, outlined above, are much like Petitioner's facts. Despite the fact that the testimony of Burt at trial established that the information was obtained during a conversation with Petitioner and King, and that the information was incriminating, the Idaho Court of Appeals rejected the claim, stating: "Hansen presented no admissible evidence in his post-conviction proceedings as to what specific questions were asked, what specific answers were given, and whether any of the questions or answers were incriminating in nature." (State's Lodging J-4, p. 14.) Contrary to the basis on which the Idaho Court of Appeals rejected Petitioner's *Massiah* claim, in *Henry* the Court explained that "[w]hether Massiah's codefendant questioned Massiah about the crime or merely engaged in general conversation about it was a matter of no concern to the *Massiah* Court." 447 U.S. at 272 n.10. Rather, application of the *Massiah* rule

turned on whether the state had "intentionally creat[ed] a situation likely to induce Henry to make incriminating statements without the assistance of counsel." *Id*. at 274.

Petitioner's testimony at the Motion to Dismiss hearing that Burt followed him around asking questions established that Burt actively participated in the conversation. Petitioner's testimony was nonspecific, but it was similar to that given in *Henry*, where the only evidence cited by the United States Supreme Court was that, "according to his own testimony, Nichols [the informant] was not a passive listener; rather, he had "*some conversations* with Mr. Henry" while he was in jail and Henry's incriminatory statements were "*the product* of this conversation" (emphasis added). It is difficult to see why the Idaho Court of Appeals required Petitioner to state "what specific questions were asked, what specific answers were given, and whether any of the questions or answers were incriminating in nature," when Mr. Henry won his case on equally vague descriptions. Petitioner's and Nichols's statements are almost equally vague, except Petitioner states that Burt actually asked him questions, while Nichols' testimony was centered only on "conversation."

While the state district court used a negative credibility determination of Petitioner to reject the testimony that Burt followed him around and asked him questions, Petitioner's credibility has no bearing on (1) the fact that the trial testimony of Burt at Petitioner's trial and King's trial established that the

**MEMORANDUM DECISION AND ORDER - 41**

information was gained in conversations with Petitioner, and (2) the fact that the Burt testimony was incriminating, based on a review of the content of the testimony.

The state district court placed much emphasis on the fact that Steven King requested Burt to contact Hansen in the jail to ask him questions, and Steven King was not a state actor. However, the only topic in the record that King asked Burt to ask Petitioner was why he did not do something more to ensure that Windle would not testify against them. There is nothing in the record establishing that either detectives or King asked Petitioner to find out any *other* information from Petitioner. Burt did not testify about Windle at trial. Therefore, the *Massiah* issue cannot be disposed of on the basis that this was either a three-way conversation, or that King asked Burt to find out the answer to a *very specific* question, the answer to which *was not relevant to Burt's actual trial testimony.*

The state district court also used as the basis for denying the *Massiah* claim the fact that "Hansen does not contest the veracity of the information obtained in the three-way conversation and summarized in the statements in the police report. The court of appeals, relying on a similar conclusion of the state district court notes: "Hansen did not testify that Burt elicited incriminating statements. Rather, Hansen denied having made any incriminating statements to Burt at all." This Court finds that these conclusions are not reflective of the evidence in the state court record. Petitioner testified at the hearing that they did speak of some things

related to the charges but Burt then "construed the statements around" in his trial testimony. In addition, the trial transcript of Burt's testimony, together with the police report, show exactly which incriminating statements Burt testified that Petitioner made.

The point of *Massiah* is that Burt should have been prevented from testifying *at all* about the statements Petitioner made that could have been construed by Burt to be incriminating statements. In addition, whether or not Petitioner contests the veracity of the statements—in other words, whether the statements Burt made were true—is not a reason to deny a *Massiah* claim, because the *Massiah* rule exists to keep out the truth or what a witness propounds as truth, allegedly spoken without the presence or advice of counsel.

In reviewing the factual findings of the state court, the Court concludes that the state courts made unreasonable findings of fact under *Taylor v. Maddox*, because the courts "plainly misapprehend[ed] the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim," or, because the state court "ha[d] before it, yet apparently ignore[d], evidence that supports petitioner's claim." 366 F.3d at 1000-01.

In addition, though Petitioner was afforded something of an evidentiary hearing in state court on his *Massiah* claim, the brief telephonic evidentiary hearing in this circumstance amounted to a "defective fact-finding process" under *Taylor v. Maddox*, because of its cursory nature and because Petitioner was present

only by telephone, obscuring the important element of observation of a witness's demeanor.

Because the factual findings were unreasonable, this Court can review the claim de novo. To show entitlement to habeas corpus relief on de novo review, Petitioner must not only show a *Massiah* violation based on the facts in the record or any new facts in a federal evidentiary hearing, he must also show that he suffered prejudice at trial as a result of the *Massiah* violation. *See U.S. v. Bagley*, 641 F.2d 1235, 1239 (9th Cir. 1981) (*Massiah* requires a showing of prejudice, and that showing was not disturbed by later case law, including *Henry*). Assuming that there is enough evidence in the record that Petitioner has shown a *Massiah* violation, and that an evidentiary hearing is not needed to make that point, the Court turns to whether Petitioner has shown that he suffered prejudice.

In assessing the impact of a *Massiah* error, the court must determine how the jury would reasonably perceive the case without the error. As set forth above, Burt's testimony that was derived from overhearing others or from speaking to Petitioner prior to the government engaging him as an agent was admissible. The only portions of Burt's testimony that were derived from a conversation with Petitioner are that Petitioner told Burt he was involved in manufacturing methamphetamine when they had a discussion in jail about "we had it going on up there," and that Petitioner said that the methamphetamine they produced was for sale. (State's Lodging A-2, pp. 64-73.)

In assessing the impact of the inadmissible testimony from Burt, the Court must also review the elements of the crime charged. Petitioner was charged with conspiracy to traffic in methamphetamine by manufacturing, between the dates of August 12, 2000, and August 1, 2001, pursuant to Idaho Code § 37-2732B(a)(3) and 37-2732(f). (State's Lodging A-1, pp.18-20.) The charge included the elements that one of the parties to the conspiracy agreement performed at least one of the following overt acts: "(1) Purchased and/or supplied precursors for the manufacture of methamphetamine; or (2) Actively participated in the cooking process for the manufacture of methamphetamine; or (3) Provided a location for Steven King and/or other unnamed individuals to manufacture methamphetamine; or (4) Aided in the storage of equipment and chemicals used for manufacturing methamphetamine; or (5) Distributed methamphetamine." (State's Lodging B-1, Jury Instruction 14.)

If the jury had not heard from Burt that Petitioner allegedly said, "We had it going on up there"—meaning "the production of the methamphetamine, the life-style that we were having," and Petitioner's admission that the methamphetamine they produced was for sale (State's Lodging A-2, p. 64), then the jury nevertheless had ample evidence before it that Petitioner was involved with Amy Fluckiger, Robert Zazweta, Theodora Salazar, and Steven King in the production of methamphetamine in one or more of the five ways described in the Amended Information. Burt testified of Petitioner's involvement from his own experience.

Fluckiger testified of that fact from her own experience, including that Petitioner bought pseudoephedrine pills, kept Zazweta's manufacturing equipment in a closet in Petitioner's bus, and ran errands to get items Zazweta needed to manufacture methamphetamine. Fluckiger testified that they made the methamphetamine to sell, and that Petitioner received a portion of the money. (State's Lodging A-2, p. 319-20.)

The detectives testified that they found equipment and chemicals in and around Petitioner's bus, including scales and small baggies. Officers saw Petitioner leave the Windle property to refill a propane tank, and saw him with King in the KOA campground, and retrieved written methamphetamine recipes from King's person the same date. The store clerk testified that Petitioner bought a gallon of iodine. The detective testified that a gallon of iodine is enough to treat 400 cattle. Petitioner had told someone else in jail that he transported methamphetamine to Utah via airport shuttle bus. Petitioner carried two fake ID cards.

The Court concludes that proof of Petitioner's guilt during the time period of August to December 2000 was substantial, even without the erroneous admission of the two statements of Burt showing that Petitioner had admitted he was involved in the manufacturing and sale of methamphetamine. Therefore, Burt's testimony on these two points did not have a prejudicial effect or influence on the jury's verdict. Accordingly, the Court concludes that any *Massiah* error did not prejudice Petitioner's defense.

Accordingly, Petitioner has not shown prejudice under *Massiah* or *Strickland*. Hence, habeas corpus relief under a de novo standard of review, either based on a direct *Massiah* claim or a *Strickland* claim, is not warranted.

**3.     Claim Four (A): Failing to Obtain King Trial Transcript**

Claim Four (A) is that trial counsel rendered ineffective assistance by failing to obtain a transcript of Burt's testimony from the Steven King trial or to impeach Burt's testimony with prior inconsistent statements (Dkt. 46, pp. 32-34.) Petitioner asserts that Burt's testimony about who and what he saw regarding the methamphetamine production in Petitioner's bus between King's trial and Petitioner's trial was contradictory, and that Petitioner's counsel could have used the King trial transcript to impeach Burt.

The Idaho Court of Appeals addressed the claim, concluding that Burt's testimony was not inconsistent:

> [T]he fact that a witness testifies in greater detail at a subsequent trial does not render testimony at a prior trial inconsistent. This is especially true in light of the fact that specific questions were asked of Burt at Hansen's trial regarding Hansen's involvement in methamphetamine production to which he gave specific answers. Contrary to his argument, Hansen has not shown a "marked difference" in testimony such that an evidentiary hearing should have been granted on this issue. The testimony was not inconsistent. Moreover, as the post-conviction court pointed out, Hansen's trial counsel attended King's trial and made his own notes. Hansen has failed to show that trial counsel rendered deficient performance.

(State's Lodging J-4, pp. 9-10.)

At the King trial, Burt testified that the *first time* he went to the bus on the Windle property was at the behest of his fiancee, to check to see how Zazweta was doing in the face of his recent separation from his wife. (State's Lodging I-1, p. 123.) "And at that time Robert was doing what he was doing up there, and I witnessed on three occasions of the lab in production." (*Id.*)

Counsel asked Burt about the physical layout of the Windle property, and then went back to Burt's comment that he had seen methamphetamine being produced on the bus three times, to which Burt responded, "Yes." (*Id.*) Counsel then asked Burt, "And can you please describe, I guess, what you saw, what it as when you went in the bus? What did you see?" This question was not clearly directed at a first, second, or third time, or all three times.

Burt testified, "[Well, *when I went in*, Robert [Zazweta] had a beaker of—it would be red phos, and in this beaker he was heating it up with a torch." (*Id.*, emphasis added.) He then described the layout of the bus and said, "*When I walked in the one time*, Robert [Zazweta] was in the front room heating up the red phos." (*Id.*, emphasis added.)

When Burt was asked whether he believed, based on his experience, what he saw was a methamphetamine lab, Burt responded:

> Well, yeah, because *at that time* Robert [Zazweta] said, "You look very nervous, Mitch." And I go, "Yeah, I am, Robert. This is not cool." I go, "I don't even want to be any part of this."

(State's Lodging I-1, p. 24.) When asked who was in the bus when he "saw that," Burt identified "Timmy Hansen [Petitioner]," "Teddy [Salazar]," "Karen Honas," "Robert Evans," and said there were also about five other people he did not know. (*Id.*, pp. 24-25.)

At Petitioner's trial, Burt again testified that the *first time* he went to the bus was because his fiancee had asked him to go check on Zazweta, who was separating from his wife. (State's Lodging A-2, p. 67.) He testified that when he went into the bus, he saw Zazweta, Salazar, and Petitioner "cooking dope, cooking methamphetamine," and, in particular, Petitioner "had a Mountain Dew bottle in his hand, and Petitioner was duct taping it onto a tube, and in the tube was phosphate, which is one of the ingredients to manufacture methamphetamine." (State's Lodging A-2, p. 67.)

As the state courts, this Court concludes that these descriptions of the "first time" Burt went to the bus and observed the production of methamphetamine are consistent, but that an expanded version regarding Petitioner's role was included at Petitioner's trial.

At the King trial, Burt was not asked to describe the *second* time he went to the bus and saw the methamphetamine production. (See State's Lodging I-1, pp. 24-39.) At Petitioner's trial, Burt was asked what he saw the second time he went to the bus. He testified that he saw Petitioner "over a burner drying the meth." (*Id.*, p. 68-69.) The Court concludes that there is nothing contradictory between Burt's

testimony on this point between the two trials, because it simply was not addressed in King's trial.

At the King trial, Burt was not asked to describe what he saw on his *third* visit to the bus. At Petitioner's trial, Burt testified that, on the third visit, he saw Petitioner sleeping, and he saw "Teddy [Salazar] drying it and Robert [Zazweta] was just looking at the condenser and showing me how the beaker dripped dope – dripped methamphetamine into the other beaker, which is in oil. And I told Robert I didn't want to learn, and we kind of got in an argument over it." (State's Lodging A-2, p. 69.)

The Court concludes that there is an ambiguity, but no clear inconsistency, between the trial testimonies regarding whether Burt and Zazweta argued during Burt's first trip to the bus or his third trip to the bus. Burt was testifying about the first incident at the King trial, but then counsel interrupted him with questions about all three times; it is unclear whether Burt then testified about his first, second, or third trip to the bus. At Petitioner's trial, counsel was careful to ask about the first, second, and third incidents in chronological order. In any event, cross-examining Burt over whether he argued with Zazweta on the first or third visit to the bus would have been a weak challenge to the substance of Burt's testimony or his credibility.

In reviewing this claim, the Court further notes that Burt was adept at explaining perceived differences in his testimony. For example, on cross-

examination, Petitioner's counsel questioned Burt about seeing Zazweta and Petitioner in September 2000, because Zazweta had been arrested and jailed on September 5, 2000. Burt then corrected himself and said, September of 2000, "and the end of August of 2000." (*Id.*, p. 82.)

On a similar point, counsel specifically asked Petitioner about conflicts in testimony between what he reported to police officers and what he had stated during direct examination about Petitioner's involvement:

> Q.    You testified the second time you went up to the residence that you saw Tim with a glass Pyrex, is that correct?
>
> A.    Yes.
>
> Q.    Do you recall doing an interview on 11/13, 2001, with Detective Russell Wheatley and Gary Steven Brush?
>
> A.    Yes.
>
> Q.    In the police report on that date there's a comment in the police report that you stated you observed Theodora Salazar moving a Pyrex style cake pan over a burner and stirring the substance inside the pan at the rear of the bus. Is that correct?
>
> A.    What was the name?
>
> Q.    Theodora S-a-l-a-z-a-r.
>
> A.    Yes, she – I witnessed that.
>
> Q.    I'm confused. Did you witness her doing it or did you witness Tim Hansen doing it?
>
> A.    I witnessed them both. *At the time that –*

Q.      That's fine.

A.      Okay.

(State's Lodging A-2, pp. 83-84 (emphasis added.)

This testimony shows that Petitioner's counsel questioned Burt about a perceived inconsistency between Petitioner's trial and a police report, just as he might have done between Petitioner's trial and Burt's trial, had counsel obtained a transcript, but that Petitioner was able to easily explain the perceived discrepancy. The only major discrepancy between Petitioner's trial and Burt's trial is regarding the timing of an argument between Burt and Zazweta, which is only slightly relevant to the substance of the testimony and would have been only slightly impeaching. Petitioner does not acknowledge the greater risk that Burt could have testified to more damaging information about Petitioner's involvement in the conspiracy on re-direct examination had counsel gone further in his cross-examination about "discrepancies."

An examination of the trial transcripts demonstrates that the Idaho Court of Appeals' opinion is based on a reasonable determination of the facts in the record and is not an unreasonable determination of *Strickland*. Petitioner has shown neither deficient performance nor prejudice. Therefore, under the doubly-deferential standard for *Strickland* claims discussed in *Richter*, § 2254(d) relief is not warranted.

### 4. Claim Four (B): Failing to Obtain Accomplice Instruction

Claim Four (B) is that trial counsel was ineffective for failing to obtain a jury instruction that Burt was an accomplice in the conspiracy. (Dkt. 46, pp. 34-37.) Petitioner argues that, had an accomplice instruction been given regarding Burt, then his testimony could not have been used to corroborate Fluckiger's testimony, but both would have needed independent corroborating evidence.

The Idaho Court of Appeals concluded that it was of no consequence to the outcome of the trial that an accomplice instruction was not given:

> The corroborating evidence is sufficient to tend to connect Hansen to the crime independent of the accomplices' testimony. Therefore, Hansen has failed to demonstrate that the post-conviction court erred in summarily dismissing his claim because he suffered no prejudice in any failure to include Burt as an accomplice.

(State's Lodging J-4, pp. 12-13.)

Petitioner argues that the State's entire case rested only on "the testimony of two drug manufacture[r]s who both have prior felony drug convictions and who were both involved in a methamphetamine producing operation a year prior to Hansen being arrested." (Dkt. 46, p. 7.) The characterization that Hansen and Fluckiger provided the only evidence of Petitioner's involvement in the methamphetamine production is not supported by the record. Ample additional independent evidence was produced from the detectives, store clerk, and lab criminalist to show that Petitioner was involved in the methamphetamine production in the bus during the latter half of the year 2000. Idaho law requires

only that the corroborative evidence be "slight" and need only "tend" to connect the defendant to the crime. *State v. Stone*, 216 P.3d 648, 651 (Idaho Ct. App. 2009). All of the additional evidence beyond the testimony of Fluckiger and Burt meets this low standard.

In addition, the record contains little evidence that Burt was an accomplice to the conspiracy that was charged—the production of methamphetamine in Petitioner's bus during the year in question. Burt testified at King's trial that he was "a little bit involved" with Fluckiger, who was herself involved with King, but no details of the extent of his involvement are apparent, other than he was at the her house one time with Fluckiger and King, and  that he gave her an advance warning that he heard on his police scanner that police were going to raid her residence. (State's Lodging I-1, pp. 35-37.) Burt testified at Petitioner's trial that he used methamphetamine, visited the bus on several occasions (and told the conspiracy participants that he did not want to be involved), and spent time partying with the members of the conspiracy. Amy Fluckiger particularly testified that Burt was not involved in the production process, and, while the detectives who were investigating the lab mentioned the names of others that they had investigated in connection with the lab, Burt's name was not among them.

Based upon the entire record, Petitioner has failed to show that the Idaho Court of Appeals's decision rejecting this claim was unreasonable, particularly

because Petitioner has not shown any prejudice arising from the failure to seek an accomplice instruction regarding Burt. Thus, habeas corpus relief is not warranted.

5.      **Claim Four (C): Confidential Informant Police Report**

Claim Four (C) is that trial counsel performed ineffectively when he failed to properly use the report of Detectives Charles Burke and Glen Boodry (Mixing up their names, Petitioner has called this the report of "Charles Broody"). (Dkt. 46, pp. 38-40.) Detective Burke's report contains information about an interview with a confidential informant, "CI-397," who told police that, in April 2011, Steven King normally manufactured 20 to 30 grams of methamphetamine at a time, that King lived in Petitioner's old bus while Petitioner was in jail, that he saw and helped King manufacture methamphetamine in the bus, and that King usually obtained phosphorus from Robert Zazweta or Troy Hall. (State's Lodging E-2, pp. 62-63.) The report did not mention that Petitioner or Amy Fluckiger were present or provided supplies for the methamphetamine production in April 2001.

The post-conviction court rejected this claim on the basis that it was a strategic part of the defense to exclude the report from evidence at trial. Petitioner's trial counsel's Affidavit stated:

> I acknowledge that I did not use the police reports as way of exhibits or for impeachment purposes. This decision was done in the exercise of my reasonable professional judgment. I talked with Mr. Hansen about the potential listed witnesses and their expected testimony. Mr. Hansen's [sic] did tell me not to worry "I've got my ducks lined up."
> * * *

I reviewed with Mr. Hansen all defense witnesses and exhibits that he wished to use during his trial. Specially, Mr. Hansen and I talked about who to use for a witness or what exhibit to use and the specific reason to use that person or exhibit. Any person we did not call as a witness was based upon my professional reasonable judgment and agreed upon with Mr. Hansen.

I had legitimate strategic or tactical purposes not to call certain witnesses or use the police reports.

(State's Lodging I-1, pp. 178-79.)

The post-conviction court recognized that the report linked Petitioner's residence (the bus) to the manufacturing of methamphetamine described by the confidential informant—evidence that strengthened the State's case. Based on this information, the Affidavit of counsel, and Petitioner's failure to dispute the fact that counsel declared that Petitioner did not have an objection to not using the police reports as exhibits, the post-conviction court concluded that exclusion was strategic and counsel had not performed deficiently.

Petitioner argued on appeal that the state district court decision was erroneous because the Affidavit of counsel failed to identify the police report or give a specific reason for excluding the police report, and because his counsel actually tried to question one of the officers about the report during the trial, but it was not one of the officers who had written or witnessed the report (and who were not called at trial). In cross-examining Detective Donald Broughton, Petitioner's counsel asked: "I received a police report dated 4/18, 2001, in which one of the details in there states that Steven King's residence is the same place Timothy

Hansen lived prior to being sent to jail. Do you have any knowledge of this police report?" The witness answered, "No." (State's Lodging A-2, p. 365.)

Petitioner did *not* address on appeal the threshold admissibility question regarding confidential informant statements contained within a police report—an obvious double hearsay problem. The Court of Appeals addressed this issue sua sponte, concluding that Petitioner failed to show that the statements were admissible. (State's Lodging J-4, p. 15.)

If the statements were inadmissible, then Petitioner's counsel did not perform deficiently, and he was not prejudiced by the failure to try to introduce the police report into evidence. There does not appear to be an Idaho case specifically addressing informant statements contained in police reports, but cases from other jurisdictions show that the Idaho Court of Appeals's opinion on admissibility of double hearsay echoes the interpretation of similar evidentiary codes in other states. *See Gronland v. Illinois Farmers Ins. Co.*, 1994 WL 121627 (Minn. App. 1994) (police reports containing an out-of-court statement by a detective to a police officer that a confidential informant had said a sibling of her former boyfriend had told her that the former boyfriend admitted to setting the fires was inadmissible because the evidence is multiple hearsay and each statement was not shown to qualify as an exception to the hearsay rule. *See* Minn.R.Evid. 805). *See also People v. $53,240 U.S. Currency*, 2012 WL 752071 (Mich. App. 2012) ("We assume without deciding that the police report itself satisfies the admissibility

requirements of MRE 803(6), the business record exception to the hearsay rule. However, the statements of Felix and the confidential informant recounted in the police report constitute second-level hearsay, inadmissible under any exception to the hearsay rule.")

At least one case from Idaho regarding a witness's statements in a police report follows the same rule, though not specifically involving a confidential informant, and no Idaho cases to the contrary exist. *See, e.g., State v. Vivian*, 924 P.2d 637, 640 (Idaho Ct. App. 1996) (Assuming the district court ruled correctly regarding the police report, we must then determine whether Vivian's statement, recorded within the police report, was admissible. References to Vivian's statement was hearsay and not admissible unless it met a separate hearsay exception.").

In addition to addressing the admissibility issue, the Idaho Court of Appeals rejected Petitioner's arguments on other grounds, pointing to the fact that Petitioner's counsel had declared by affidavit that he reviewed all of the exhibits with Petitioner, that Petitioner was made aware of the strategic or tactical reasons for not using the evidence that was not used, that Petitioner agreed with the decisions, and that Petitioner did not bring any evidence to the contrary in the post-conviction proceeding. The Idaho Court of Appeals agreed with the district court that the reports contained both helpful *and* harmful facts, and Petitioner had not

come forward with enough to overcome the strong presumption that counsel performed deficiently, or that any prejudice resulted.

One reasonable inference that can be drawn from counsel's actions at trial supports Petitioner's position that his counsel did, in fact, try to gain admissibility of the police report, but did so incorrectly, essentially gutting counsel's explanation that he did not use the report as a matter of strategy. However, another reasonable inference supports his counsel's position that the nonadmission of the report was strategy—counsel may have recognized that the confidential informant statements within the police report likely were inadmissible, and so he tried to use a back-door approach to placing this information before the jury by merely questioning an officer about the contents, without attempting to introduce the report into evidence. Petitioner did not produce evidence in the post-conviction proceeding to support his theory over his counsel's theory. Petitioner bore the burden to refute the statements in the Affidavit by coming forward with testimony showing that counsel did not go over the police report with Petitioner, that Petitioner did not agree that it should not be used, or that the internal statements were admissible and should not have been merely discussed with a witness. Petitioner had ample opportunity to do so in post-conviction proceedings, and yet did not. Therefore, the only evidence in the record is Petitioner's counsel's statement of what he did, what Petitioner did, and why.

The Court further agrees that Petitioner has not shown that his defense was prejudiced by the failure to introduce the police report. Petitioner's argument seems based upon a misapprehension of the charges against him. The State did not need to show that he was involved during the *entire* year, only during part of the year. Therefore, even if evidence was introduced that Steven King lived in the bus between April 2001 and June 2001, while Petitioner was in Utah, and that Petitioner did not help manufacture methamphetamine between April 2001 and June 2001, that does nothing to refute the evidence that witnesses placed him in the methamphetamine manufacturing conspiracy between August 2000 and December 2000. Burt testified that he saw Petitioner aiding in the manufacturing between August 2000 and October 2000. (State's Lodging A-2, pp. 67-70.) Fluckiger testified that Petitioner aided in the manufacturing between August 2000 and December 2000. (*Id.*, p. 311.) Petitioner's mother testified that Petitioner was living in the bus from August to December 2000, when she took lunch to him and visited with his daughter on the Windle property. (*Id.*, pp. 425-426.) Several witnesses testified that Petitioner bought a gallon of iodine in December 2000.

In addition, the State did not have to show that he was a main player in the conspiracy. Rather, the evidence showed he was a "helper" or a "gofer," which is enough under the statute to be a conspirator. The confidential informant did not mention Amy Fluckiger as a conspirator in April 2001, but Fluckiger herself admitted her role and testified about Petitioner's role during a time period within

the year included in the charging document. The police report did not exonerate Petitioner or Fluckiger; it was merely a piece of evidence that methamphetamine production continued to go on in the bus Petitioner usually used as a home while he was away from home.

Petitioner's ineffective assistance of trial counsel claim fails for lack of a showing of deficient performance and lack of prejudice.

## DISCUSSION OF MERITS OF *NAPUE* CLAIM

Claim Three (C) and Claim Six are that recruited informant Burt testified falsely regarding his motive for testifying, and the prosecutor allowed and failed to correct the false testimony, in violation of *Napue*. (Dkt. 46, pp. 26, 51-56.) Petitioner alleges that Burt testified that he was providing testimony out of community spirit and good will and that the State had not offered him any special treatment in exchange for his testimony, and, yet, two weeks after trial, all of Burt's remaining charges were dropped. Later, Petitioner testified at King's trial that he used and manufactured methamphetamine while on parole, and, yet, the State did not charge him with a parole violation. Petitioner asserts that the prosecutor should have corrected Burt's testimony regarding his motivation to testify.

### 1.    Standard of Law

In *Napue v. Illinois*, 360 U.S. 264 (1959), the United States Supreme Court held that the prosecution (1) cannot present evidence it knows is false and (2) must

correct any falsity of which it is aware. *Id.* at 269. A claim that the prosecution

knew that a witness perjured himself is cognizable under 28 U.S.C. § 2254(d)(1),

but a petitioner must establish that the prosecutor knew that testimony was false.

*See Napue*, 360 U.S. at 269. A conviction meets the *Napue* test and a writ will

issue if there is a showing that (1) the prosecution knowingly presented false

evidence or testimony at trial, and (2) that the testimony was material, meaning

there is a reasonable likelihood that the false evidence or testimony could have

affected the judgment of the jury. *See Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir.

2005) (*en banc*).

It is well established that evidence of an agreement or promise of lenient

treatment in exchange for a witness's testimony against a defendant may constitute

evidence that must be disclosed under *Brady* and *Napue. See Giglio v. United

States*, 405 U.S. 150, 154–55 (1972)); *see also Banks v. Dretke*, 540 U.S. 668, 685,

700–02 (2004) (finding a *Brady* violation where prosecution failed to disclose that

key witness "was an informant and that he had been paid $200 for his involvement

in the case").

## 2.     State Court Decision

The Idaho Court of Appeals addressed this claim on appeal of denial of the

post-conviction application. That court concluded that the state trial court's

"findings and conclusions are supported by the record, and the inferences drawn

by the trial court are reasonable," even though it was possible to draw conflicting

inferences from the facts. (State's Lodging A-4, pp. 6-8.) The Idaho Court of Appeals relied on the Affidavit of Burt's attorney, Kent Reynolds, that directly contradicted Petitioner's allegation that an agreement existed between Burt and the State for favorable treatment in exchange for his testimony. (State's Lodging I-1, pp. 195-96.) In addition, at trial, the prosecutor solicited on direct examination testimony from Amy Fluckiger, an accomplice, that she had been granted immunity in exchange for her testimony against Petitioner; therefore, the court reasoned, it is unlikely the prosecutor would have hidden a grant of immunity for another witness.

**3.      Analysis**

This Court agrees that the record supports two different inferences: one that Burt had no agreement with the prosecution for favorable treatment, and one that Burt and the prosecution had  an implicit agreement that, if Burt testified against Petitioner, he would receive favorable treatment in his own pending criminal case. Four items strongly favor the inference that the state district court selected: (1) Burt's attorney's Affidavit declaring that there was no agreement or understanding, and that he specifically warned Burt about testifying without an agreement in place; (2) the fact that the prosecution actually raised the issue of Fluckiger's grant of immunity on direct examination; (3) the fact that Burt volunteered to provide information to detectives without requesting recompense in his case; and (4) Burt's long and detailed explanation of how his life and his

children's lives had been severely impacted by Burt's heavy involvement in drugs. (State's Lodging A-6, pp. 62-63.) On the other hand, factors tending to show that there was an implicit agreement in place include: (1) Burt's criminal charges were dismissed two weeks after he testified at Petitioner's trial; and (2) police officers asked Burt to obtain information about Petitioner in jail, but that was not disclosed to Petitioner's counsel or raised by the prosecution on direct examination.

The Court disagrees with Petitioner that there was so much evidence showing there was an implicit agreement or promise of action between the prosecution and Burt prior to Petitioner's trial that the testimony of Burt at trial amounted to false testimony that the prosecution was duty-bound to "correct." There is more evidence weighing in favor of finding there was no agreement or understanding, especially given Burt's attorney's advice to him about the risks of testifying without an agreement in place. In any event, under the *Richter* standard, if fairminded jurists could disagree on the correctness of the state court's decision, as here, then a federal court cannot grant relief under § 2254(d)(1).

The facts of this case raise the question of when an expectation that is induced by State recruitment crosses the line into a promise or an agreement. Under AEDPA, Petitioner must show that United States Supreme Court precedent exists that addresses this question. Precedent from lower cases can be examined to determine the reasonableness of the Idaho Court of Appeals's decision.

Cases in which a constitutional violation has been found include those in which there is evidence of either an express agreement, an implicit agreement, or a benefit conferred upon the witness prior to trial. *See United States v. Sipe*, 388 F.3d 471, 488 (5th Cir. 2004) (illegal alien witnesses were given social security cards, witness fees, trip permits to Mexico, travel expenses, phone expenses, and other benefits); *United States v. Soto–Beniquez*, 356 F.3d 1, 40 (1st Cir. 2003) (prosecution witnesses received oral assurances of leniency in exchange for their testimony); *Reutter v. Solem*, 888 F.2d 578, 581 (8th Cir. 1989) (the Court found the government knew but did not disclose that its main witness had applied for a commutation hearing and the hearing was twice rescheduled to occur after the witness testified at defendant's trial).

A witness's "general and hopeful expectation of leniency is not enough to create an agreement or an understanding that they would, in fact, receive leniency in exchange for their testimony." *Collier v. Davis*, 301 F.3d 843, 849 (7th Cir .2002), *cert. denied*, 537 U.S. 1208 (2003). *Shabazz v. Artuz*, 336 F.3d 154, 165 (2d Cir. 2003); ("that a prosecutor afforded favorable treatment to a government witness [post-trial], standing alone, does not establish the existence of an underlying promise of leniency"); *Hill v. Johnson*, 210 F.3d 481, 487 (5th Cir. 2000) (a witness's "nebulous expectation of help from the [S]tate" is not *Brady* material).

An explicit agreement is not necessary, but there needs to be sufficient

evidence in the record for the court to be able to find that an implicit understanding

or agreement to grant the witness favorable treatment existed. In *Sivak v.*

*Hardison*, 658 F.3d 898 (9th Cir. 2011), where the same issue arose regarding

State's witness Jimmy Leytham, the United States Court of Appeals for the Ninth

Circuit determined that

> although there is no evidence of an explicit meeting of the
> minds between Leytham and the prosecutor's office, there is ample
> evidence of an implicit quid pro quo between the prosecutor's office
> and Leytham, and that this agreement was known to Harris, Killeen,
> and Leytham. We therefore agree with the Idaho Supreme Court's
> factual conclusion "that Leytham and the prosecutor had reached
> some type of deal in exchange for his cooperation." *Sivak V*, 8 P.3d
> at 643.

658 F.3d at 910.

During the guilt phase of the trial, Leytham testified that he had "a wife and

kids out on the streets," and he did not "want anything to happen to them." He

denied that he had asked for any particular favor from the State in exchange for his

testimony. Asked whether the prosecutor's "office or any other State agency" took

any actions "with regard to [his] incarceration [in] the Ada County jail," Leytham

said only that his escape charge was dismissed after the preliminary hearing, and a

charge pending in another city was also dismissed. Leytham said that he did not

know whether the prosecutor's office was involved in the dismissals.

The Idaho Supreme Court concluded that:

> Much of [Leytham's] testimony the prosecutor knew to be
> inaccurate. As Killeen's letter makes obvious, Leytham approached
> Killeen about a "deal," not out of a sense of familial or civic
> responsibility. Leytham also asked the prosecutor for monetary
> compensation. Leytham knew that the prosecutor's office was
> responsible for his pending charges being dismissed. Although he
> denied receiving any other consideration, he also knew that the
> prosecutor's office was largely responsible for him receiving parole.

658 F.3d at 910.

Those letters included the following information to support a *Napue* claim:

The first letter was written on May 7, 1981, by Ada County
prosecutor Jim Harris to Dennis Albers, the prosecutor of a
neighboring county in which a charge was pending against Leytham
for escaping jail. Harris explained that Leytham had "come to law
enforcement in Ada County with very damaging eviden[ce] against
three inmates in the Ada County Jail presently being held on murder
charges." Harris acknowledged that "[t]he escape charge that you
have presently pending against Mr. Leytham is ... of serious concern
to you and your office[,]" but he nevertheless "request[ed] that
charges against Mr. Leytham in Idaho County, relating to the escape
above mentioned, be dismissed by your office." Harris explained that
his request was "[b]ased on [Leytham's] cooperation, as well as the
fact that Mr. Leytham is presently serving a sentence in the Ada
County Jail resulting from" a prior offense. Harris concluded by
adding, "I do believe that based on the fact that Mr. Leytham will
obviously not be sentenced to the State Penitentiary (based on his
willingness to testify against these individuals), justice will be served
adequately without proceeding further on the escape charge pending
in your jurisdiction."

The second letter was written a few days later by Harris to the
chairman of the state Commission for Pardons and Parole. Harris
"recommend[ed]" that Leytham "be given additional consideration
for parole from the Idaho State Correctional Institute" during his
upcoming parole hearing the following week. Harris's
"recommendation [was] based upon Mr. Leytham's cooperation"
with respect to the two trials in the Wilson murder, the murder trial
in Kansas, and an additional local murder investigation.

The third letter was written on July 13, 1981, by Leytham to Jerry Brown, who was "evidently a Kansas prosecutor." *Sivak V*, 8 P.3d at 640. Leytham wrote that Idaho investigator "Vaughn [Killeen] told me you are in the same position Idaho is in. They say they will help me when I get out but don't do any thing [sic] about it." Leytham added that he wanted $6,000 "cash" as "wit[ ]ness fees as soon as you can." A few weeks later, Brown forwarded this letter to Killeen.

The fourth letter was written on July 27, 1981, by Killeen to Leytham. The letter began: "Your witness fee should arrive shortly.... I also wanted to communicate to you about your status and what this office has done in regards to your current status. If you recall you had information regarding the Bainbridge–Sivak case and you approached me about a 'deal.' I informed you we couldn't make 'deals' but if you desired to testify I would attempt to do something for you but there would be no guarantees." Killeen then summarized the "arrangements" that were made in anticipation of Leytham's testimony in the Sivak, Bainbridge, and Crispin cases: "the dismissing of criminal charges against you in two jurisdictions, a reduction in sentence and a parole from the Idaho State Correctional Institute." Killeen closed by stating that "[w]ithout our intervention you would still be in prison with other pending criminal charges against you. I would suggest you stop trying to make a living off the system.... I will see you at the deposition" in Sivak's case. *Sivak V*, 8 P.3d at 645.

*Id*. at 909-10.

The Ninth Circuit Court of Appeals determined that these findings about Leytham's testimony established the first two elements of a *Napue* violation: that the testimony was false, and that the prosecution knew or should have known that it was false. *Id*. at 911.

In contrast to all of the examples above from several different courts, Petitioner shows little more than that Burt hoped and unilaterally anticipated he

would receive favorable treatment in his case, but that nothing was promised, and no agreement—implicit or explicit—existed. Rather, the evidence in the record, especially the Affidavit of Burt's counsel, shows that an agreement or promise did not exist.

**4.    Conclusion**

The totality of the evidence weighs in favor of the Idaho Court of Appeals's decision, and Petitioner has not shown that fairminded jurists could not disagree on the correctness of the state court's decision that there was no explicit or implicit agreement or understanding that Burt would receive leniency in his own case for testifying against Petitioner. Accordingly, relief cannot be afforded under § 2254(d)(1).

## SUMMARY AND DISPOSITION OF PETITION

No trial and no review of a trial record on appeal or collateral review is perfect, but the Constitution does not require perfection for a conviction to stand. This Court has combed through the record to determine whether prejudice resulted from any of the errors evident in the record, and it has found none. Because Petitioner's claims do not warrant relief for the specific reasons above, the Court will deny the Amended Petition and dismiss this entire action with prejudice.

## REVIEW OF THE CLAIMS AND THE COURT'S DECISION
## FOR PURPOSES OF CERTIFICATE OF APPEALABILITY

In the event Petitioner files a notice of appeal from the Order and Judgment in this case, the Court now evaluates the claims within the Petition for suitability for issuance of a certificate of appealability (COA), which is required before a habeas corpus appeal can proceed. 28 U.S.C. § 2253(c)(1)(A); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); Rule 11(a), Rules Governing Section 2254 Cases.

A COA will issue only when a petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has explained that, under this standard, a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.*" Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal citation and punctuation omitted).

When a court has dismissed a petition or claim on procedural grounds, in addition to showing that the petition "states a valid claim of the denial of a constitutional right," as explained above, the petitioner must also show that reasonable jurists would find debatable whether the court was correct in its procedural ruling. *Slack,* 529 U.S. at 484. When a court has dismissed the petition or claim on the merits, the petitioner must show that "reasonable jurists would find

the district court's assessment of the constitutional claims debatable or wrong." *Id.*

at 484. The COA standard "requires an overview of the claims in the habeas

petition and a general assessment of their merits," but a court need not determine

that the petitioner would prevail on appeal. *Miller-El*, 537 U.S. at 336.

Here, the Court has dismissed some of Petitioner's claims on procedural

grounds, and some on the merits. The Court finds that additional briefing on the

COA is not necessary. Having reviewed the record again, the Court concludes that

reasonable jurists would not find debatable the Court's decision on the procedural

issues and the merits of the claims raised in the case and that the issues presented

are not adequate to deserve encouragement to proceed further. As a result, the

Court declines to grant a COA on any issue or claim in this action.

If he wishes to proceed to the United States Court of Appeals for the Ninth

Circuit, Petitioner must file a notice of appeal in this Court **within thirty (30) days**

**after entry of this Order**, and he may file a motion for COA in the Ninth Circuit

Court of Appeals, pursuant to Federal Rule of Appellate Procedure 22(b)(2).


## ORDER

**IT IS ORDERED:**

1.    The Amended Petition for Writ of Habeas Corpus (Dkt. 46) is

       DENIED, and this entire action is DISMISSED with prejudice.

2.  The Court will not grant a Certificate of Appealability in this case.

DATED:  **July 22, 2014**

Honorable Edward J. Lodge
U. S. District Judge